## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 24 2018, 6:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Steven E. Ripstra
Jacob P. Wahl
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.B., Father, and B.B., Minor Child, | May 24, 2018 |
| | Court of Appeals Case No. 19A01-1712-JT-2972 |
| A.B., | |
| *Appellant-Respondent,* | Appeal from the Dubois Circuit Court |
| v. | The Honorable Nathan A. Verkamp, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 19C01-1707-JT-271 |
| *Appellee-Petitioner.* | |

**Kirsch, Judge.**

[1] A.B. ("Father") appeals the juvenile court's order terminating his parental rights to his minor child, B.B. ("Child"). Father raises two issues on appeal, which we restate as whether the juvenile court's judgment terminating his parental rights to Child was clearly erroneous.

[2] We affirm.

## Facts and Procedural History

[3] Father and C.K. ("Mother") (together, "Parents") are the parents of Child, born in May 2016.[1] Shortly after birth, Child contracted meningitis and suffered brain damage, such that she requires significant care, including a feeding tube to eat, frequent medical appointments, therapy, and specialized daycare.

[4] In August 2016, Child was living with Mother. On August 6, 2016, Indiana Department of Child Services ("DCS") received a report concerning abuse or neglect of Child. It had been reported to DCS that Mother was using alcohol and illegal substances and that Parents had engaged in domestic violence. Mother tested positive for THC; Father refused a drug screen.

[5] On September 12, 2016, DCS removed Child from the home and filed a Child in Need of Services ("CHINS") petition for Child, alleging that Mother had tested positive twice in August for illegal substances, Father had refused to

---

[1] Following the filing of the petition to terminate Parents' parental rights, Mother voluntarily relinquished her parental rights to Child, and the juvenile court terminated her parental rights. Mother does not participate in this appeal. Accordingly, we will limit our recitation of the facts and our analysis primarily to that which is pertinent to Father.

submit to a drug screen, there was a warrant for Father's arrest for a Level 6 felony, Parents had engaged in domestic violence, Mother was soon to be evicted from the home, and DCS had received reports that Parents failed to attend to Child's medical needs. *DCS Ex.* 3. Father did not appear at the detention and initial hearing held that day, and Child was placed in foster care. On September 23, 2016, the juvenile court held another initial hearing, at which Father appeared in custody, and the juvenile court appointed counsel for Father. At a hearing held a few days later, Father appeared in custody and admitted that he was incarcerated, in need of stable housing, and could benefit from DCS services. *DCS Ex.* 6.

[6] After a fact-finding hearing that Mother had requested, and following Father's admissions, the juvenile court adjudicated Child to be a CHINS on October 18, 2016. *DCS Ex.* 7. On November 15, 2016, the juvenile court held a dispositional hearing and, on November 22, entered a dispositional order that contained various requirements for Parents. Among other things, Father, who at that time was not in custody, was ordered to: (1) contact the DCS family case manager ("FCM") weekly and notify the FCM of changes in address or phone number; (2) enroll and participate in recommended programs and keep appointments; (3) maintain safe and stable housing; (4) ensure that Child is properly clothed, fed, and supervised and meet all medical and mental health needs of Child; (5) obey the law; (6) submit to random drug screens; and (7) attend scheduled visitation with Child and comply with visitation rules. *DCS Ex.* 8.

[7] At a February 6, 2017 review hearing, the juvenile court found that Father, while incarcerated, had been working with services, such as participating in Fatherhood Engagement and home-based therapy and completing a parenting assessment, but when released to work release, Father failed to comply and was "again incarcerated" such that supervised visits were placed on hold. *DCS Ex.* 9. Father failed to appear for review hearings in May 2017 and July 2017; evidence was presented that Father had inconsistently participated in drug screens, services were suspended due to his missing three consecutive screens, and he had participated in only one supervised visitation. *DCS Ex.* 10. On July 13, 2017, the juvenile court found that Father had not complied with services, including visitations, and he had not contacted DCS since his release from incarceration; the juvenile court changed the permanency plan from reunification to adoption. *DCS Ex.* 11.

[8] On July 21, 2017, DCS filed an amended petition to terminate the parental rights of Father and Mother, and, at that time, Father was in the Dubois County Jail. At an October 2, 2017 CHINS review hearing, the juvenile court found he had not participated in services, including visitation. *DCS Ex.* 12. On November 8, 2017, the juvenile court held a fact-finding hearing. At the beginning of the hearing, and at DCS's request, the juvenile court took judicial notice, without objection, of four pending criminal causes against Father. *Tr. Vol. II* at 13-14. DCS called as witnesses the FCM, two service providers, two court-appointed special advocates ("CASA"), the current foster mother, and Father.

[9] DCS FCM Nicole Elliott ("FCM Elliott") testified that DCS became involved on reports of drinking in the home and concerns for Child's safety. FCM Elliott stated that, at the beginning of the case, she met with Mother, but she was unable to reach Father. When she visited the home, Child was lying on a crib mattress on the floor and did not move or open her eyes. FCM Elliott stated that throughout the course of the case, Father did not maintain consistent contact with her and that at times she would attempt to contact him, including through an investigator, but he was "very difficult to get in touch with or even to locate." *Id.* at 70. FCM Elliott described that Father was offered various services, including supervised visitation, Fatherhood Engagement, ongoing random drug screens, a substance abuse assessment, parenting assessment, and home-based therapy, but Father mostly participated only when he was incarcerated. She said that, after released, Father "made minimal efforts" with services, meeting with providers inconsistently and that "didn't last more than a month or so." *Id*. at 66. FCM Elliott stated that when Father was placed on work release, he visited Child once. She said many visitations were scheduled, but that "he never made his call ahead, so they were cancelled."[2] *Id*. at 66-67. FCM Elliott said that Father visited with Child "two or three" times during the course of the case and completed one drug screen. *Id*. at 67. FCM Elliott expressed her concerns about Father's ability to care for Child and her medical

---

[2] FCM Elliott explained that a call ahead was required for visitations because "it takes a lot of time to prepare all of [Child]'s things. Her medication, some of them have to be refrigerated, so getting all of that gathered up to get to a visit is time consuming [for the foster family]." *Tr. Vol. II* at 67.

issues and stated that Father has not had stable employment or housing. FCM Elliott's opinion was that termination and adoption were in Child's best interests, and there was a family was willing to adopt her. *Id*. at 74.

[10] Rachel Schipp ("Schipp"), a therapist with Ireland Home Based Services ("Ireland"), testified that Father completed a substance abuse assessment around November 2016 and a parenting assessment in January 2017; he was incarcerated at the time of both assessments. Schipp also provided individual therapy to Father at the jail, working on substance abuse, relapse prevention, coping and anger management skills, and maintaining healthy relationships. Schipp said that Father participated when he was incarcerated, but after he was released in March or April 2017, she only saw him once, noting that she had "difficulties getting in touch with him." *Id*. at 20. Schipp said that due to nonparticipation, his case was put "on hold" and transferred to a supervisor, who would be responsible for further client contact and services. *Id.* at 21.

[11] Caroline Green ("Green"), a home-based case manager with Ireland, provided services to Father from October 2016 to April 2017 concerning how to feed Child through the feeding tube, employment, housing, budgeting, and stable relationships. Father was incarcerated some or all of that time. After Father was released in March or April 2017, Green supervised visits with Child. Due to Child's medical condition, it was necessary to "call ahead" to schedule visits to allow time to get medical supplies ready, and Father did not always call ahead and, therefore, missed visitations. *Id*. at 90-91. Green said he did not maintain regular contact with her after he was released from incarceration,

describing that "it started off pretty well and then it just trickled off until he "stopping participating altogether," to the point "where [she] was . . . trying to locate him[.]" *Id*. at 81. Green stated that she had difficulty scheduling visits because Father did not contact her. When asked about Father's stability, she stated that he lived with various friends and relatives and that he had a history of "very unstable and very one-sided relationships," in which Father would rely on the person he was dating to provide housing, money, and transportation. *Id*. at 85. Because Father did not maintain contact with Schiff and with Green, Ireland put his services "on hold" in April 2017. *Id*.

[12]     Elaine Schitter ("Schitter") worked with Child as a CASA volunteer beginning in September 2016, having responsibilities to see that the placement was suitable, to participate in team meetings, and work with the DCS's FCM. Schitter said when she first began on the case, Child would not make eye contact, had seizures, and could do little. She described that Child's first foster family was "very good" with her, but became overwhelmed due to the fact that Child required "so much intensive care." *Id*. at 56. She said she met Father one time, after a hearing, and she described his participation throughout the case as "minimal." *Id*. Schitter said that Father "learned a little bit" about feeding Child, and he had a couple of visits. *Id*. at 58. Schitter stated that she would have "a lot of concern" about placing Child with Father, considering Child's complex medical needs and Father's history showing a lack of accountability and responsibility. *Id*. at 57. Schitter testified that she was "impressed" with Child's development with the foster family, not only in terms

of love and care, but knowledge of Child's medical needs. *Id.* In May 2017, Schitter began employment with CASA as a manager, and Child's case was assigned to another volunteer CASA, Danielle Wendholt ("CASA Wendholt").

[13] CASA Wendholt began working with Child's in May 2017. She testified to not having any direct contact with Father because she was never able to reach him. She was "tremendously" concerned with Father's lack of participation in services, including that he had not attended Child's doctor appointments or spent time with her to learn Child's "vast" medical needs. *Id.* at 60. CASA Wendholt said that termination of Father's rights and adoption were in Child's best interests. *Id.* at 60-61.

[14] The mother in Child's current foster placement ("Foster Mother") testified that Child had been placed with her family since October 2016. She stated that, at first, Child "just kind of laid there," but that Child had "really progressed and c[o]me a long way" since first coming to their home. *Id.* at 50. Foster Mother stated that Child required a lot of medicines for seizures and that Child sees twenty-three doctors and therapists. Foster Mother drives Child to her appointments, many of which are at Riley Children's Hospital. Child also receives in-home physical, occupational, vision, and other therapies. Foster Mother stated that Child "smiles now" and will make eye contact and make little noises when she hears the voices of the foster family. *Id.* at 52. Foster Mother said she "absolutely" would be willing to adopt Child. *Id.* at 53.

[15]  Father testified to having other children, but he does not have custody of them, and they reside with their respective mothers. *Id*. at 25-26. Father never resided with Child and Mother, and, at some points during the pendency of the current case, he was homeless. He stated that he was employed for six months or so, but not otherwise employed during the case. Father testified that he does not have a driver's license because it was suspended for resisting law enforcement in a vehicle. *Id*. at 29, 33. Father could not identify exactly what medications that Child was required to take, but stated, "I know how to feed my daughter. I know what medication to give her." *Id*. at 30-31. Father admitted that "as of right now" he could not provide Child with the stability that she required. *Id*. at 32. With regard to contact with DCS, Father stated that he called his caseworker almost daily for several months, leaving his address and phone numbers, and never received a reply. Father stated that, while he was on work release, he worked seven days per week and generally twelve-hour shifts, and was "doing programs" as well. *Id*. at 30. Father testified that he wanted Child back, did not want his rights terminated, stating, "I feel like I was not given the full opportunity to prove that I can take care of my daughter." *Id*. at 45. His request was to get his services "back on track" and get "a second opportunity to at least be there for my daughter[,]" noting that he was talking to his family again and that they agreed to help him and provide support. *Id*. at 93.

[16]  On November 16, 2017, the juvenile court entered an order terminating Father's parental rights to Child ("Order"). *Appellant's App. Vol. II* at 8. Its

findings included that: Father was offered services and visitation but "never remotely attained compliance" with the dispositional order; he failed to maintain contact with DCS and was difficult to locate; he was arrested on various criminal charges while the proceedings were pending; he takes no responsibility for his failures and "seems to blame all parties in this case for conspiring against him"; Father's testimony was "largely [] dubious and self-serving"; and Father "has demonstrated not a smidgeon of the stability and responsibility necessary to ensure the Child's safety." *Id.* at 9-11. The juvenile court concluded that there was a reasonable probability that the conditions which resulted in Child's removal and continued placement outside the home would not be remedied, the continuation of the parent-child relationship posed a threat to Child, termination of parental rights was in Child's best interests, and there was a satisfactory plan for the care and treatment of Child. *Id.* at 14-15. Father now appeals.

## Discussion and Decision

[17] As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his

responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013)*.* The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re T.F.*, 743 N.E.2d at 773. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re J.C.*, 994 N.E.2d at 283*.*

[18] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of

fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[19] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings; second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[20] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[21] Father argues that DCS failed to prove the required elements for termination by clear and convincing evidence and asserts that the juvenile court's judgment was clearly erroneous. Specifically, he claims that DCS did not prove that (1) the conditions that resulted in Child being removed or the reasons for her placement outside the home would not be remedied, (2) the continuation of the parent-child relationship posed a threat to Child's well-being, (3) termination was in Child's best interests, (4) there was a satisfactory plan in place for Child.

### *Remediation of Conditions*

[22] Father urges that while he was in custody, he participated in recommended services. *Appellant's Br*. at 11. He acknowledges, however, that:

> [a]fter [F]ather left work release, his participation in services, therapy, visitation, communication with the DCS and updating his contact information tapered off. Father has an inconsistent record of updating DCS as to his employment, housing, and contact information which made locating him during [] both the CHINs and TPR case difficult and inconsistent. Father's compliance with drug screens was rare and infrequent.

*Id.* at 6-7 (citations to record omitted). Father's argument on appeal is that, given that he "did participate in services while incarcerated" and "did make some progress[,]" he "should have been given more time to accomplish what was ordered of him[.]" *Id.* at 11.

[23] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child*

*Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *A.F.,* 762 N.E.2d at 1252.

[24] In this case, after Child was removed from the home, Father admitted that Child was a CHINS and acknowledged that he could benefit from DCS services. The juvenile court ordered him to, among other things, stay in contact with DCS, find suitable housing and employment, submit to drug screens, obey the law, and complete recommended services. He did none of those. Throughout the proceedings, Father was in and out of incarceration and work release. While incarcerated, he did participate in some services; however, when he was not in custody, Father did not stay in contact with DCS and providers and minimally participated in services. He did not attend Child's medical appointments or engage in services to learn how to safely attend to Child's significant medical needs. Father was arrested and charged with multiple criminal offenses while this matter was pending. He had a total of two or three visitations with Child, had employment for only six months, and did not obtain stable housing.

[25] DCS is not required to rule out all possibilities of change, it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. Also, as we have recognized, "Even assuming that

[the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's placement outside the home would not be remedied.[3]

### Best Interests

Although not specifically identifying it as an issue on appeal, Father includes in his argument that the juvenile court erred when it determined that termination of his parental rights was in Child's best interests. *Appellant's Br.* at 12-13. Father argues that he was making progress and his efforts "were thwarted" when Child "continued to be removed from his care" after he was released from work release. *Id.*

In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the

---

[3] We need not address Father's challenge to the juvenile court's conclusion that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interest of the child. *In re A.P.* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[28] The record before us reflects that Father did not take any steps after Child was removed to enhance or improve his ability to fulfill his parental obligations. When Father was not incarcerated, he did not consistently participate in services, was hard to locate, did not maintain housing or employment, and did not stay in contact with service providers. Father essentially argues that he should be given more time to show that he has the ability to parent Child and can provide her with a stable home. However, a trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re A.K.,* 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a

child.  *Id*. (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[29] CASA Schitter stated that she would have "a lot of concern" about placing Child with Father, considering Child's complex medical needs and Father's history showring a lack of accountability and responsibility.  *Tr. Vol. II* at 57.  CASA Wendholt likewise was "tremendously" concerned with Father's lack of participation in services, including that he had not attended Child's doctor appointments or spent time with her to learn Child's "vast" medical needs.  *Id*. at 60.  Based upon the totality of the evidence, we conclude that the evidence supported the juvenile court's determination that termination of Father's parental rights was in Child's best interests.

### *Satisfactory Plan*

[30] We have held that for a plan to be "satisfactory," for purposes of the statute, it need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.  *In re A.S.,* 17 N.E.3d at 1007.  A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the child or children.  *Id.*  In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent.  *Id.*

[31] Here, evidence was presented that Child had made progress while living with Foster Mother, who had a good understanding of Child's medical needs and was willing and able to take Child to her many medical appointments.  Foster

Mother testified that she "absolutely" would be willing to adopt Child. *Tr. Vol. II* at 53. The juvenile court did not err in determining that DCS had a satisfactory plan for Child's care and treatment.

[32] Again, decisions to terminate parental rights "are among the most difficult our trial courts are called upon to make" and are very fact sensitive. *In re E.M.*, 4 N.E.3d at 640. We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[33] Affirmed.

[34] Baker, J., and Bradford, J., concur.